United States District Court
Western District of Washington

FILED
RECEIVED
JUN -7 2023
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACO.
BY                          DEPUTY

Luis A. Leon, 44559-013      Case Number:
V.                           2:22-cv-00851-JNW-TLF
Elledge
J. Manansala
Harris                       **BIVENS**
Smith                        **ACTION**
I. Jacquez
Shaikh                       Plaintiff demands a trial by:
Federal Bureau of Prisons    ☑ Jury

Plaintiff in the above-mentioned action, alleges as follows:
## JURISDICTION

1. This is a civil action brought pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2201.

## Parties

2. Plaintiff: Luis Alfonso León, #44559-013
Address: SEATAC Federal Detention Center
P.O. Box 13900
Seattle, Washington 98198
I am a sentenced and convicted federal prisoner.

Defendants

pg. 1/2

3. a.) Defendant: Elledge
Official Position: Prison Official
Address: SEATAC Federal Detention Center
P.O. Box 13900
Seattle, Washington 98198

b.) Defendant: J. Manansala
Official Position: Prison Official
Address: SEATAC Federal Detention Center
P.O. Box 13900
Seattle, Washington 98198

c.) Defendant: Harris
Official Position: Prison Official
Address: SEATAC Federal Detention Center
P.O. Box 13900
Seattle, Washington 98198

d.) Defendant: Smith
Official Position: Counselor
Address: SEATAC Federal Detention Center
P.O. Box 13900
Seattle, Washington 98198

Defendants.

Pg. 2/2

e.) Defendant: I. Jacquez
   Official Position: Warden
   Address: SEATAC Federal Detention Center
            P.O. Box 13900
            Seattle, Washington 98198
f.) Defendant: Shaikh
   Official Position: Chaplain
   Address: SEATAC Federal Detention Center
            P.O. Box 13900
            Seattle, Washington 98198
g.) Defendant: Federal Bureau of Prisons
   Official Position: Agency
   Address: Federal Bureau of Prisons
            P.O. Box 474701
            Des Moines, Iowa 50947-0001

## Facts

4.) Count 1: First Amendment Violation Memorandum    1/26

1.1  A burden, substantial enough to violate the First Amendment was placed on my sincerely held religion.

1.2  The First Amendment protects us from such heavy burdens being placed on our sincerely held religions. What heavier burden is there than having to choose between betraying your religious beliefs or or having to feel pain enough to violate the Eighth Amendment as a consequence for upholding your religious vows? This Bivens Action's purpose is to shine light on a systematic deficiency that violated my rights. This deficiency causes the majority of vegetarians — religious or not — to suffer prolonged periods of starvation and undue prejudice, as we wait for our diet's approval.

1.3  Most people experience a level of discomfort - like stomach pain - when they have to skip a meal. There also exists a certain level of psychological discomfort that may accompany a missed meal - like headaches, anxiety, crankiness, etc.. Any layman can admit this to be true. Now, imagine being forced to skip a total of 12 meals in a span of 7 days, eating much less than the minimum caloric requirement each one of those days. That is exactly what occurred to me from April 7th to April 13th, 2022 because of an unconstitutional policy of approval for religious no-flesh diets.

1.4  The deficient policy in question here is that in order for a religious or flesh-free diet to be approved, it must first go through the Chaplain.

Pg. 5/26

Count 1: First Amendment Violation Memorandum

This policy and the Prison Officials upholding said policy, in light of obvious deterioration of my health, are responsible for placing a heavy burden on me and on any individual who chooses a "no-flesh" diet – especially if it is a diet used in the exercise of sincerely held religious beliefs. If it is the F.B.O.P.'s goal to abide by the Constitution and avoid needlessly applying undue pressure and harm to it's "no-flesh" diet inmates then this matter should not be taken lightly. The Federal Bureau of Prisons and it's facilities have the burden of setting an example, for rehabilitation purposes, so that inmates can see that rules are being followed and rights are respected. It goes without saying that hunger causes painful discomfort and prolonged hunger may evolve into – as it did in my case – deterioration of physical and mental health.

1.5    I have gone through this exact same type of torture during my First indictment (U.S. v. Leon, Case No. 18-cr-00020-MSK-GPG) while housed in Mesa County Jail, Jefferson County Jail, and Fairplay Jail. Although these locations are in Colorado, I am mentioning them here for the purpose of informing the Court that I have first-hand experience that this is a problem in many institutions that house federal inmates and receive federal funding. This will only grow as a problem for the government because there are more vegetarian/vegan inmates now, more than ever, after the "Vegan Boom" a few years back. When I was first arrested

Count 1: First Amendment Violation Memorandum                    pg 3/26

in 2017, I was usually the only vegetarian, but now in 2022-2023 a veggie plate is a common sight. Therefore, this may be a compelling governmental interest and fixing this policy is the least restrictive means of furthering that interest. No one should have to starve while awaiting clergy verification.

1.6      "For the purpose of applying the RLUIPA (or in my case the RFRA), government action or regulation creates "substantial burden" on religious exercise if it truly pressures adherent to significantly modify his religious behavior and significantly violates his religious beliefs; and, effect of government action or regulation is significant when it either: (1) influences adherent to act in a way that violates his religious beliefs, or (2) forces adherent to choose between, on one hand enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs." See (Adkins v. Kaspar, 393 F.3d 559). This case hits the nail on the head. I had to choose between going against my religious belief and consume a sinful product of animal slaughter or follow my religious beliefs and starve. That is a prime example of a "substantial burden."

1.7      One key fact is that I should not have had to wait for my diet to be approved by the Chaplain here in SEATAC FDC for as long as I did because my diet had already been approved in Colorado's Englewood FDC in 2019 and this institution knew it. Their knowledge

Count 1: First Amendment Violation Memorandum                    Pg. 4/26

of this fact was evident to me upon reading my "Team Meeting" sheet that I submitted as evidence. The sheet says that I was approved for a "no-flesh" diet since August of 2019(that's when I was in Englewood) and not April 10th, 2022 when I was told it was approved by Chaplain Shaikh. However, I did not receive my first "no-flesh" meal until the 13th of April, 2022.

1.8    The verification process for my diet placed a substantial burden on the exercise of my religion, and the Defendants did not employ the least restrictive means of furthering a compelling governmental interest. I could have been given peanut butter and bread as far as restrictive goes but that did not happen. "Clergy verification requirement operated as substantial burdens on inmate's religious exercise under (RLUIPA) where (1) prison officials' clergy verification requirement was responsible for rendering inmate's religious exercise effectively impracticable; and (2) prison officials failed to meet their burden that they were employing the least restrictive means of furthering compelling governmental interests." See Koger v. Bryan 523 F.3d 789, 70 Fed. R. Serv. 3d (Callaghan) 532, (7th Cir. 2008).

1.9    The fact is that for 7 days I ate much less than the minimum caloric requirement the F.B.O.P. has set to feed inmates daily. According to Jones v. Gallahan, prison officials must provide a prisoner in isolation with a "diet containing a minimum caloric requirement that will not be rejected on religious grounds." (emphasis added). The court

Count 1: First Amendment Violation Memorandum                Pg 5/26

noted that this requirement may be met by providing acceptable food alternatives. Since this did not occur until the last meal of the 13th of April, 2022, the RFRA was violated. Prison officials failed to provide me with acceptable food alternatives and thus also failed to show that policy was used in furtherance of a compelling governmental interest, or that they used the least restrictive means of furthering that interest. On the 7th of April, 2022 I received a "sack lunch" containing peanut butter, jelly, bread, an apple and water, and dinner was rejected on religious grounds. The 8th I ate brown cereal flakes (about a handful was provided), that is all, and only because there was no dead animal flesh present on the tray, lunch and dinner were rejected on religious grounds for containing flesh. I did the exact same thing from the 8th, 9th, 10th, 11th and 12th of April, 2022. On the 13th of April, 2022 I ate the cereal flakes and only rejected lunch because dinner was when I received the first of the "no-flesh" trays. That is a total of 12 meals missed between the 7th and 13th of April of 2022.

[Side Note] In an attempt to avoid excess diarrhea and dehydration, I did not drink the milks because I am lactose intolerant. Since I have already gone through this same suffering in other facilities I was just preparing for the worst, the best way I knew how, while I waited for my diet's approval. I also avoided the breakfast pastry to avoid the risk of eating egg since egg products are usually found in pastries. Abstaining from eating eggs is part of the Vaishnava culture and religion.

Count 1: First Amendment Violation Memorandum                B 6/26

1.10    As an inmate in federal custody, I am completely dependent on the government's permission to eat, or practice my religious beliefs in this federally funded facility. My diet does not mess with the order and safety of this facility, nor was my request to such a diet excessive; the RFRA absent a physical injury applies. In my case, however, there was pain involved and although most of those injuries were not lasting, the mental and physical damage occured. nonetheless and the prison officials involved acted under the color of law which make them liable for suit in their individual capacity. Since the Defendants work in SEATAC FDC and this facility and it's faculty receive federal funding, then the Federal Bureau of Prisons is also liable. In Haywood v. Drown it says that this case, "struckdown a New York State legislative attempt to the jurisdiction from New York courts to hear claims based on 42 U.S.C. § 1983. The attempt to shield correctional officers from liability violated the Supremacy Clause."

1.11    I did not do this, but for arguments sake; let's say I ate the entire breakfast tray. That would still only be a total of 610 calories, and that's being generous. 2 milks is a total of 160 calories, the brown flakes as cereal cannot be more than 150 calories because of the serving size, the pastry is maybe 300 calories, and there is also a zero calorie sweetener. This information is based on product nutrition labels and from what I learned in the prison's Nutrition course

Count 1: First Amendment Violation Memorandum    Pg 7/26

that I was certified for. Then, using the court's reference for the daily caloric intake of 2,000-2,500, we will see that I consumed much less than that. See Cunningham v. Jones, 667 F.2d 565, 566 (6th Cir. 1982) (finding one meal a day for 15 days, where meal contained 2,000 to 2,500 calories and was sufficient to maintain health, constitutionally adequate). Therefore, I did in fact consume much less than the minimum caloric intake. Even if somehow the standard was half of that (1,000-1,250), the entire breakfast tray (610) would still not meet that standard. The fact remains, however, that I did not eat the full breakfast trays to avoid diarrhea, dehydration and breaking my religious vows. by consuming egg from the pastry. A.C. Bhaktivedanta Swami Prabhupada and other authorized spiritual masters have passed down, through disciplic succesion, the instruction to stay away from eggs.

1.12    In order to supplement this suit and have it make more sense, I must provide the spiritual facts. I have practiced Vaishnavism since 2013 and even became a Vaishnava bramacari monk for a very short while in 2015. I have been a vegetarian for over a decade now since January of 2013 when I first converted. The Gaudiya Vaishnava School sect is recognized as a bonafide religion by the U.S. government, commonly heard of as "The Hare Krishna Movement" or International Society for Krishna Consciousness (ISKCON).

Count 1: First Amendment Violation Memorandum               Pg. 8/26

There are a large number of established temples for the worship of Krishna around the world and in the U.S. as well. At least 108 temples belong to ISKCON. Sri krishna is the original name of God according to our scripture and Sri Krishna is the speaker in the Bhagavad-gītā, an ancient holy scripture about 5,000 years old. Bhagavad-gītā is, in a sense, our "Bible." My religion is labeled under Hinduism as far as the F.B.O.P. is concerned. Bhakti-yoga, among other names, is what Vaishnavism is, loving devotional service unto the Supreme Personality of Godhead, Sri Krishna. In Bhagavad-gītā, chapter 9, texts 26-27 it says,

> "If one offers Me with love and devotion
> a leaf, a flower, fruit or water, I will
> accept it. O son of Kunti, all that you do, all
> that you eat, all that you offer and give away,
> as well as all austerities that you perform,
> Should be done as an offering unto Me."

In these texts, Sri krishna is letting the people in general Know, among other things, what is offerable to Him, that all we eat should first be offered. Nowhere in Bhagavad-gītā does Sri Krishna speak of animal slaughter or death being offered to Him. So we Vaishnavas offer our Sweet Lord only what He asks for in an attempt to abide by His instruction. In fact, animal flesh is considered to be in the mode of ignorance and vegetables, grains, fruit, flowers, etc., are considered to be in the mode of goodness.

Count 1: First Amendment Violation Memorandum                          pg. 2/26

We practice eating only Ahimsa foodstuffs which means no indulging in by-products of violence, and how can one eat flesh from an animal if not by violent means? Bhagavad-gītā mentions that if we eat anything unoffered or unofferable, we are "verily eating only sin." Sri Isopanisad, mantra 1 says,

> "Everything animate or inanimate that is within the universe is controlled and owned by the Lord. One must therefore accept only those things necessary for himself which are set aside as his quota, and one must not accept other things knowing well to whom they belong."

Since meat is unofferable to Krishna then it is not for us to take or eat. Eating flesh makes us thieves, each bite incurring more and more sin. We can only go back home, back to Krishna, if we are free of sins which makes eating animals a great stumbling block on our spiritual advancement. The Vedas (Vedic/Vaishnava scripture) also mentions that those who eat meat are duskritinas (rascal, nescient) and candalas (dog eater, lowest of mankind, outcaste). That the animals we eat will have a chance to eat us in return in our next life. Since we firmly believe in Vedic authority and believe in reincarnation, you can only imagine how serious we take this. Anyone claiming to be Vaishnava and wanting to make spiritual progress which improves character and our chances to be freed from samsara (cycle

Count 1: First Amendment Violation Memorandum                    pg. 10/26

of birth and death), must abide by these 4 regulative principles; no illicit sex, no intoxication, no gambling; and no killing. This last principle includes no eating beef, chicken, fish, or any animals or their eggs, whether they are full of life or not, because eating products of death is a sin. Bhagavad-gītā, text 18 says, (chapter 5)

"The humble sage, by virtue of true knowledge sees with equal vision a learned and gentle Brāhmana, a cow, an elephant, a dog and a dog eater (outcaste)."

Although the bodies mentioned above differ from one another, each one of those bodies has a soul, that soul comes from God, and so does our soul, therefore, eating one of them is like eating our own brothers and sisters. Finally, the symptoms of the soul are summed up to 4, that is to say that the embodied soul eats, sleeps, reproduces, and defends itself, which is why we see the murder of a human equal to the murder of a cow. We would never eat our own brother or sister so similarly we would not eat an animal. Buddhism and other Vedic sects also abstain from eating animals for similar reasons derived from Vedic Scripture.

1.13    The impetus to file this lawsuit came from prison official Elledge. He was the prison official, along with others yet to be mentioned, that disregarded my rights as a prisoner and as a human being. After letting the intake officers know about my religious diet they said that I needed

Count 1: First Amendment Violation Memorandum                    pg. 4/26

to let the officer know in quarantine once I got there. So I told Elledge about it and he said that the Chaplin has to approve it. I asked Elledge if he could please let him know for me. Elledge then explained to me the "cop-out" process which is a hand written request on a sheet of paper labeled "Cop-out." Elledge said that I may not be able to get ahold of the Chaplain until Monday. The problem with the, I explained to Elledge, is that I should not have to starve for days until my diet is approved. Elledge said he could do nothing for me and left. Each time he passed by my quarantine cell #41 in EA unit, I would beg for his help, literally saying "please." I explained to Elledge that I could not eat the meals because eating flesh went against my religious beliefs. He was a very rude person and would often laugh or scoff or simply ignore me and my please for help. I asked for at least a food alternative like peanut butter but that I was not going to receive special treatment. After a few days of pleading with Elledge and others, I was beginning to reach a peak of pain and distress. At one point I told Elledge that I wanted to avoid filing a lawsuit to which he responded, "I'm going to give you an opportunity to sue." In other words, his deliberate indifference to my health and rights became crystal clear. His disregard for my health, religion, physical and mental pain, prisoner's rights and constitutional rights gave me all the push I needed to file suit. I believe my diet was approved the 10th but I did not see my first no-flesh meal until the 13th of April, 2022, at dinner. By the

Count 1: First Amendment Violation Memorandum          pg. 13/26

10th I was feeling hopeless, frustrated, anxious, and the almost unbearable hunger and depression gave me low energy. My mental state was obviously deteriorating and so was my physical strength and appearance. My eyes began to look sunken in with bags under them and the dark around my eyes gave me the appearance of a "raccoon" as my cellmate Solomon Leverette put it. I felt worn out. Elledge was made aware of all the meals I had to reject on religious grounds and even told Elledge to compare my current face with my I.D.'s picture so that he would see the grave difference. I even informed him of the nausea and diarrhea, and of course the pain. Days with no food cause liquid stool to come out for lack of sustenance. The headaches were causing me great pain too. The complete list of symptoms are to be found in "Count 3: Eighth Amendment Violation Memorandum." Elledge, however, could care not care less. I remember him telling me that I should stay out of prison and that I should "just eat it," in response to letting him know that I haven't eaten because of flesh in the trays. In other words, he was tempting me to go against my religious beliefs, disregarding my rights and the RFRA. I told Elledge to please research "religious diets in prison," so he could see that my rights were being violated but did not care to even do that, nor was I ever given any food alternatives what so ever.

Prison official J. Manansala is another person to violate my rights.

Count 1: First Amendment Violation Memorandum                    Pg. 13/26

J. Manansala was neglectful to my deterioration condition because I explained to him that I had not eaten an entire meal since my arrival and I asked him for help and for food alternatives but he said there was nothing he could do and did nothing. Just like Elledge, J. Manansala too lacked in training and knowledge necessary to keep me safe and in refusing to help or speak out, he violated my rights. He knew of my pangs yet deliberately was indifferent to my obvious suffering. When someone does not eat for days, you can be certain that they are suffering. I once asked an official named Lawrence here what he would do if he saw that an inmate's rights were being violated and like any knowledgeable officer with the inmate's safety in mind said that he would speak out to superiors about it. I asked J. Manansala to please speak to a superior or help me speak to one, yet no superior ever came. I do believe that J. Manansala and Elledge did speak to people about me but only to get a good laugh and I'll explain why I believe that in Prison Official Harris' portion of facts in "1.15". I asked J. Manansala to please research my rights for a chance to mitigate the legal situation but he refused. I know that J. Manansala knows how to research rights because once, after April, we argued constitutional rights when he read my legal mail and he went out of his way to go research this just to come to me to prove that he was right. Had he been so diligent as to research regarding my health and rights then he may not have been a defendant in this civil matter. On another day before the 13th during one of his walks,

Count 1: First Amendment Violation Memorandum                    pg. 14/26

I asked him, "brother, please help me, I'm hungry. Don't you have any compassion?" With a stoic, emotionless face and tone he said, "no", and continued on his way. His deliberate indifference became evident in his ommission to help because of his verbal confirmation and actions or lack thereof. No matter how many times I asked him for help, I was unable to exercise my religious beliefs and it's diet, resulting in the continued deterioration of my health.

1.15    My encounter with prison official Harris was brief but it struck a chord in my heart so deep that I felt like crying out of anger and sadness. An orderly that helps pass out our food, being a witness to all my missed meals, said that Harris was some sort of "pencil pusher", and that he may have enough influence to help. I called out to Harris. Harriss arrives, leans against the wall next my door and laughs as if I said something funny or like he knew. I deduced that he already knew of me because of what he said next. Harris said, "Oh! You're that inmate with high standards, the door warrior." I placed my feelings in check as best I could and explained I had not eaten but he said he could not help. He supposedly can't help but he can laugh at me with others and even give me a nickname. I was like some break room joke and so were my rights. I just told him that my rights were being violated and that I was not receiving adequate nutrition. His demeanor towards me was unprofessional and mean. The name "door warrior" or "cell warrior" is a nickname given to inmates that either

Count 1: First Amendment Violation Memorandum

15/26

talks back, speaks out, is rude to, or opposes an officer supposedly because there is a locked door in between the two. In other words that name is used to call an inmate a coward of sorts. I told Harris, "if I'm a door warrior because I am fighting for my rights, does that make you a tyrant? His smile came to hault and he said, "yes." I could see that he was serious to being an oppressor. Those "high standards" that Harris was speaking are in fact not just my standards but the standards of the courts and the U.S. Constitution. Harris' lack of empathy, mean spirited nature, deliberate indifference and lack of understanding of my rights, caused the continued violation of my constitutional rights. His supposed influence was of no help to me, forcing me to continue to reject meals containing flesh in order to uphold my religious vows. As I explained in the spiritual facts (1.12), in order for me to properly practice my religion, I must offer Krishna vegetarian foodstuffs, otherwise I am sinning. Without this ritual I either starve or sin. This ritual of offering is of the upmost importance in the loving devotional service of God, called "Prasadam" or "God's Mercy," which cleanses us. Since I am in prison for violating the law and this service is God's mercy, I need all the mercy I can get. Serving God is the biggest factor in my rehabilitation and considering the lack of rehabilitation programs available to me here in SEATAC FDC, this could not be any more important to me.

1.16    I've read that a right is not earned, it is an entitlement and prison does not leave me completely bereft of rights, nor does this facility's policy trump law or the Constitution. When an individual disregards the law or rights of anyone, then there is a problem with the individual only. When several members of a faculty do this, however, then there is a problem with how these Federal employees are being trained, and this responsibility falls on the

Count 1: First Amendment Violation Memorandum

19 16/26

Federal Bureau of Prisons because these individuals are acting under the color of law.

1.17    I sent Ward I. Jacquez an email or two when I left quarantine because I had not received any responses from the handwritten "cop-outs" I sent out. I expressed that officers violated my rights, and provided the Warden with case law I found in the computer's law library. The Warden did not seem concerned in the slightest because in response the Warden said that my diet was already approved; totally dismissing what I had expressed. I wanted staff to be held responsible for what occurred to me and felt that the Warden would see I had not eaten and help discipline those responsible. Would staff respond the same regarding sexual abuse or a severe medical emergency, or was my situation simply not important enough? Whatever the case may be, it was clear that nothing was going to happen to staff and that the Warden was not concerned about my rights being violated and that I passed through literal torture. This sort of indifference harmed me and will continue to harm others unless this deficient policy gets fixed, staff receive better training and that staff are held responsible for their actions. This is no longer the Shaw Shank Redemption era of prison.

1.18    After asking for help from Chaplain Shaikh, he too, disregarded the severity of my situation after speaking to him on the 10th. By the time I spoke with him I had already experienced several days of hunger due to rejecting food on religious grounds. This is around the time diarrhea was

Pg 17/26

Count 1: First Amendment Violation Memorandum

starting to be more frequent. for lack of sustenance. He said that although my diet was approved that I would still have to wait a few more days before actually receiving a no-flesh meal. More than anyone, the Chaplain should be the most versed when it comes to religious rights. He should have suggested I get a meal that is the least restrictive like peanut butter but instead said that I will be forced to wait and that meanwhile I just eat what I can. The problem with eating what I can means that I will still be forced to eat less than the minimum requirement in calories and nutrition. I can't eat anything on trays contaminated with flesh which leaves only breakfast and that is only a max of 610 calories as explained before. Assuming I ate the entire tray, that is much less than the minimum requirement for calorie intake. Religion in Prison §7.4.6 Restriction of Diet in the law library says; "Food service provided inadequate nutrition... as to violate the Eighth Amendment. The Chaplain has the authority only to authorize medical and religious diets." In order for me to get my diet Chaplain Shaikh and food service are supposed to work together to make that happen. Lag time between approval and actually receiving my no-flesh diet violated my First and Eighth Amendment rights by rendering the practice of my religion impracticable and making me go through undue pressures and pain. I was forced to either eat pieces of cooked animal corpses or starve and Chaplain Shaikh showed deliberate indifference to my hunger and situation, even after my testimony to him.

I accuse Counselor Smith for the delay in me getting adequate nutrition. During my stay in quarantine I sent out kites every day and most of those kites I labelled as grievances on officers that did not help me with receiving no-flesh diets. I expressed in the grievances that I was starving and that officers were violating my rights. On May 7th, 2022

Count 1: First Amendment Violation Memorandum                    pg 18/26

Counselor Smith told me - in the presence of J. Manansala - that he (Counsel Smith) is responsible for reading grievances and he said that he throws away all grievances against "one of" his "officers." He said this in response to me asking him how to file a proper grievance because I had not received any responses from the ones I sent out. It is no wonder, however, why I was not able to speak to any superiors before getting access to the computer because all or most of my grievances must have not made it to their proper destinations. The courts say that federal inmates have no actual right to grievances but seeing as grievances are part of administrative remedies required to file a lawsuit, grievances should thus be a right, otherwise, as in my case, exhausting administrative remedies is illusory. Upon hearing this come out of Counselor Smith's mouth I asked for his name and he said, "I don't have to give you my name." However, I wanted his name for this lawsuit to explain why no grievances were processed. J. Manansala then threatened to take me to the "hole" or Special Housing Unit (SHU) for asking for Counselor Smith's name. He eventually gave me his name. What sort of backwards facility is SEATAC FDC where almost all staff lacks even the most basic respect when someone asks for help. This is not limited to the Defendant's list but that is all I'll say about that for now in this case.

1.20    Chaplain Shaikh further violated my First Amendment rights because

Count 1: First Amendment Violation Memorandum                    pg. 19/26

On the 10th of April, 2022, I also asked him for prayer beads and he said two things to that. The first thing he said is that my religion does not qualify for beads. Then he said that 108 beads for chanting/praying and a 109th bead to represent Krishna was against safety protocol because of the length. However, in January, 2023 he said that those beads actually are allowed and that he cannot provide them because of not having "enough funds." Then he said my religious community can donate them to the Warden and then I can get them. If the latter information is true, that means that the Chaplain lied to me about the beads when I asked him about it, thereby violating my right to exercise my religion because aside from offering things to Krishna we are also to chant daily a minimum of 16 round. Each round takes roughly 5-7 minutes to complete the 108 repetitions of Hare Krishna, Hare Krishna, Krishna Krishna, Hare Hare, Hare Rama Hare Rama, Rama Rama, Hare Hare. That at least 1,648 verses a day. That is difficult to do using only your fingers. The Vedas say that this Age of Kali-yuga (the age of quarrel and hypocrasy) the average human will have short attention spans so Sri Krishna Caytania Mahaprabhu has recommended we use tulasi wooden beads. This request for such beads does not mess with the order and safety of the facility nor is it excessive. Buddhists get beads and so do Catholics and my religion qualifies for beads. Since I never got beads and was lied to about being able to have beads the Chaplain Shaikh violated the RFRA and my First Amendment rights.

1.21    "No government shall impose a substantial burden on the religious

Count 1: First Amendment Violation "Memorandum      pg. 20/26

exercise of a person residing in or confined to an institution... even if the burden results from a ~~rule a~~ general rule of applicability, unless the government demonstrates that imposition of the burden on that person - 1.) is in furtherance of a compelling governmental interest. 2.) is the least restrictive means of furthering that interest." Eating food offered to Krishna and praying/chanting to Krishna are the two most important things in this religion. The Defendants have substantially burdened me in the exercise of my religion and they did not employ the least restrictive means of furthering that interest.

1.22    This case will not require breaking new ground. A simple fix in the intake process should resolve the issue at hand. If a no-flesh diet is given to a no-flesh diet inmate then that inmate does his or her time without the horrendous undue punishment of starving. With the increased number of vegetarians and vegans, if this is fixed, then there would also be less lawsuits which would save the government unecessary court costs. In other words, by accepting religious meals upon intake while we wait on clergy verification; A.) No heavy burden is placed on no-flesh diet inmates, and B.) Court costs for filing such complaints can be reduced. Separation from society, friends and family should be punishment enough.

1.23    I am suing all proper defendants in their individual capacity for damages because of the torture I had to endure. I am also suing F.B.O.P. for injunctive relief as explained in the "relief" portion.

Count 2: Free Exercise Clause Violation Memorandum                24/26

2.1    This claim is asserted under the Free Exercise Clause of the First Amendment. The Defendants deprived me of nutritionally adequate meals and prayer beads that conform to my sincere religious beliefs. [As explained in Count 1]

Count 3: Eighth Amendment Violation Memorandum     pg. 22/26

3.1    This claim is asserted under the Eighth Amendment. I received inadequately nutritional meals that conform to my sincere religious beliefs from the 7th of April of 2022 to the 13th of April of 2022. During that time I was denied 12 meals that conform to my religious beliefs which forced me to consume less than the minimum caloric intake as required by the F.B.O.P. The forced fasting I endured with virtually no food, save for a handful of brown cereal flakes, caused me harm and could have resulted in permanent damage. It did, however, cause rapid weight loss, which I later learned in the Nutrition Course, is not healthy, especially when accomplished threw severe fasting that people with eating disorders often do because it can cause health complications. Aside from the anxiety and depression that has increased because of my experience here in SEATAC FDC, I also went through physical and mental anguish. The symptoms included stomach pain, cramps, diarrhea, weakness, fatigue, vertigo, constant headaches, stress, and even thoughts of suicide which have subsided completely by now. All of this obviously caused me to experience insomnia and added on to my P.T.S.D. I haved diagnosed P.T.S.D, anxiety and depression even before this, ever since 2010. As far as weight loss, I lost 20 pounds from April 7th to April 15th or so when I weighed myself on a scale that was brought into EA unit.

3.2    "To state a claim for unconstitutional conditions of confinement," this court expressed to me, "a plaintiff must allege that a defendant's acts or ommissions have deprived the inmate of "the minimal civilized measure of

Count 3: Eighth Amendment Violation Memorandum                Pg. 23/26

"life's necessities" and that the defendant acted with deliberate indifference to an excessive risk to inmate health and safety." Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994) (quoting Farmer, 511 U.S. at 834); see Est. of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049-50 (9th Cir. 2002). "The circumstances, nature, and duration of a deprivation of [ ] necessities must be considered in determining whether a constitutional violation has occurred." Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2009) (A prisoner who was denied 16 meals in 23 days, lost weight, and suffered headaches and dizziness as a result of inadequate nutrition alleged a sufficiently serious deprivation to implicate the Eighth Amendment.)" See page 7, line 12 through page 8 line 3 of "Document 13" Filed on 12/23/2022. If 16 meals in 23 days violates the Eighth Amendment then my case does too where I was denied 12 no-Flesh meals in a third of the above time's example.

Count 4: Fourteenth Amendment's Due Process Clause          pg. 24/26

4.1    This policy of approval and officials upholding said policy in clear evidence of suffering undue pressures and pain, as previously mentioned in Count 1 and Count 3, violated the Due Process Clause of the Fourteenth Amendment by failing to give me a nutritionally adequate diet that conforms to my religion which caused me pain. The Federal Bureau of Prisons is also responsible for upholding this policy here in SEATAC Federal Detention Center.

Count 5: RFRA Violation Memorandum                          Pg 25/26

5.1   I claim that the defendants violated the RFRA because...
1.) Defendants placed a substantial burden on my religion by denying me 12 no-flesh meals that conform to my religion, making the exercise of my religion virtually impracticable and...
2.) that burden was substantial enough to violate my First Amendment rights, the Free Exercise Clause, my Eighth Amendment Rights, my Fourteenth Amendment Rights of Due Process and the RFRA.

# CONCLUSION

I am suing Elledge, J. Mansala, Harris, Smith and Shaikh in their individual capacity. I am also suing the Federal Bureau of Prisons. These defendants are being sued for the torture and neglect of a sincere adherent of the Vaishnava religion and for the violation of the previously mentioned rights from the dates of April 7th through April 13th of 2022.

ॐ

# Relief.

pg 26/26

I am asking for monetary damages, injunctive relief, a basic Vaishnava prayer kit (Tulasi Japa Beads, prayer bag that holds the beads as is required in my religion and counting beads that track "rounds" chanted), a Bhagavad-gīta, I want staff to be disciplined, fired or placed under arrest in accords with the law and F.B.O.P. policy, I want a transfer to an Arizona Federal facility for more family and religious support as well as to be away from the defendants, I would like an official public apology by all defendants for the torture and ridicule that I endured at their hands, I want the menu to be reviewed so that we get fed proper nutrition and I want an egg-free breakfast in accordance to my religion.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 06/03/2023

Luis A. León

_Luis C. León_

Signature of Plaintiff

Bivens Action
Cover Letter

Dear Clerk,

My name is Luis A. Leon, #44559-013, for civil case number - 2:22-cv-00851-JNW-TLF.

This is an attempt at submitting a Bivens Action meant to replace the previously filed 42 U.S.C. §1983. I could not find an official Bivens Action form from the state of Washington so I did my best to write one up. I hope it is to the courts satisfaction.

Thank you for all the court's patience and for the numerous extensions of time.

Sincerely, Luis A. Leon

Date: 06/03/2023



SEATAC Federal Detention Center
Luis Alfonso León #44559-013
P.O. Box 13900
Seattle, Washington 98198-1090

Clerk, United States District Court
United States Courthouse
1717 Pacific Ave. RM 3100
Tacoma, Washington 98402-3200

LODGED
FILED _____ RECEIVED
JUN -7 2023
CLERK U.S. DISTRICT COURT AT TACOMA
WESTERN DISTRICT OF WASHINGTON
BY _____

Legal Mail



FEDERAL DETENTION CENTER
2425 SOUTH 200TH STREET
SEATAC, WA 98198

THE ENCLOSED LETTER WAS PROCESSED THROUGH SPECIAL MAILING
PROCEDURES FOR FORWARDING TO YOU. THE LETTER HAS NEITHER BEEN
OPENED NOR INSPECTED. IF THE WRITER RAISES A QUESTION OR PROBLEM
OVER WHICH THIS FACILITY HAS JURISDICTION, YOU MAY WISH TO RETURN THE
MATERIAL FOR FURTHER INFORMATION OR CLARIFICATION. IF THE WRITER
ENCLOSES CORRESPONDENCE FOR FORWARDING TO ANOTHER ADDRESSEE,
PLEASE RETURN THE ENCLOSURE TO THE ABOVE ADDRESS.